William J. Gavin

Page 14

1 Vesper George School of Art?
2    A. No.
3    Q. Did you successfully complete the program at
4 Vesper George?
5    A. I did not.
6    Q. Did not, okay. Under what circumstances did
7 you leave?
8    A. I needed a job.
9    Q. Okay. When was that?
10   A. I'm not sure of the exact year and time.
11   Q. Do you know how far away you were from
12 getting a certificate?
13   A. Half a year.
14   Q. What did you do after you left the Vesper
15 George School of Art?
16   A. I got a job at a label company.
17   Q. At a label company?
18   A. Yes.
19   Q. What were you doing at that job?
20   A. We created and pasted, it was called
21 paste-up labels for products.
22   Q. Do you recall the name of that company?
23   A. Waldoroth Label Company.
24   Q. Could you spell that for us?

Page 15

1    A. W-A-L-D-O, I believe, R-O-T-H. Waldoroth.
2    Q. Did you attend any school after you left
3 Vesper George?
4    A. Yes.
5    Q. When did you next go to school?
6    A. Schools or were just classes.
7    Q. All right. So you left Vesper George to go
8 to work at Waldoroth. Do you recall what year that
9 was?
10   A. I don't remember exactly what year it was,
11 no.
12   Q. Do you recall how long you were at
13 Waldoroth?
14   A. Probably a year and a half.
15   Q. Were you in school at all while you were
16 working at Waldoroth?
17   A. No.
18   Q. Do you recall the next time you attended any
19 sort of classes?
20   A. Again, the only classes I took were painting
21 classes.
22   Q. All right. Do you recall when you took
23 painting classes?
24   A. I don't remember the exact dates. They were

Page 16

1 here and there.
2    Q. Okay. I'm just trying to get a sense of how
3 long after you left Vesper George it was before you
4 took any painting classes.
5    A. Oh, it was years. I'm not sure how many
6 years.
7    Q. Where did you go to work after Waldoroth?
8    A. Honeywell Information Systems in Waltham.
9    Q. When did you start working for Honeywell?
10   A. 1975.
11   Q. What was your job at Honeywell?
12   A. I was hired as a technical illustrator.
13   Q. What did that involve?
14   A. Graphic art duties of -- typical graphic art
15 duties.
16   Q. Did you leave Waldoroth to take the job at
17 Honeywell?
18   A. Yes.
19   Q. At the time you began work at Honeywell, had
20 you taken any classes in painting?
21   A. Did you say before or --
22   Q. Before.
23   A. No.
24   Q. Do you recall when after you joined

Page 17

1 Honeywell that you began taking classes of painting?
2    A. Again, actual days, I can't remember. I
3 believe I was employed -- it must have been around
4 1976, '77.
5    Q. Where did you take the painting classes?
6    A. DeCordova Museum.
7    Q. Was that part of any sort of degree or
8 certificate program?
9    A. No.
10   Q. Was that painting in relation to commercial
11 art or is that a different sort of discipline?
12   A. It was different.
13   Q. How long did you attend classes at
14 DeCordova?
15   A. They were only approximately a week.
16   Q. Did you attend any other sort of schools
17 where you took any classes or courses in art?
18   A. No.
19   Q. So you don't have any sort of a degree or
20 certificate in any sort of an art -- from any sort
21 of an art school?
22   A. No.
23   Q. Other than the classes and courses you've
24 already described for us, have you had any other

5 (Pages 14 to 17)

Page 26

1  Q. Where did Gavin Associates advertise?
2  A. In Ad Week.
3  Q. What is Ad Week?
4  A. Ad Week is a, what would you call it? A
5  business magazine for the trade.
6  Q. What trade is that?
7  A. Advertising.
8  Q. Is that -- is advertising industry an
9  industry that would use a graphic artist?
10 A. The advertising?
11 Q. Yes.
12 A. Yes.
13 Q. You advertise under the name Gavin
14 Associates, correct?
15 A. No.
16 Q. Is it Gavin Studios?
17 A. Yes.
18 Q. How long did you run the ads in Ad Week?
19 A. Approximately a year.
20 Q. Do you recall when that was?
21 A. I don't remember the exact years.
22 Q. What was the nature of the ad that you
23 ran -- or let me ask it. Was it one ad that you ran
24 for a year or was it different ads?

Page 27

1  A. It was a one ad.
2  Q. What was the nature of that ad?
3  A. A name and a phone number and service.
4  Q. Did it describe the services that Gavin
5  Studios provided?
6  A. I believe it just said graphic arts, graphic
7  artist service.
8  Q. Do you still have any of the information
9  relating to that ad at all?
10 A. No.
11 Q. What would have happened to it?
12 A. The magazines were thrown out.
13 Q. You didn't keep any records of what ads you
14 had placed?
15 A. No. It was -- no.
16 Q. Did Gavin Studios, I assume you had to pay
17 for the ads?
18 A. Yes.
19 Q. Did Gavin Studios have its own checking
20 account at all?
21 A. No.
22 Q. How were the ads paid for?
23 A. By check.
24 Q. Whose check?

Page 28

1  A. Personal check.
2  Q. Your personal check?
3  A. My personal check.
4  Q. Did Gavin Studios ever get any business as a
5  result of the ads placed in Ad Week?
6  A. Yes.
7  Q. Was that for entities other than Honeywell?
8  A. Yes.
9  Q. Is it fair to say that, to your knowledge,
10 Gavin Studios did not get any work from Honeywell
11 through the ad in Ad Week? Do you understand that
12 question?
13 A. I did not get work from --
14     MR. WILGOREN: I don't understand the
15 question.
16 Q. I'll ask it over again. At the time you
17 placed the ad, you were already doing work for
18 Honeywell, correct?
19 A. Correct.
20 Q. So your work at Honeywell was not the result
21 of the ad you placed in Ad Week?
22 A. Correct.
23 Q. What are the names of companies that you did
24 work for as a result of the ad?

Page 29

1  A. I don't remember all of them. There was
2  only a few. Crown Service Systems.
3  Q. What's the name?
4  A. Crown Service Systems, Wellesley
5  Publications, and a few odd ones that I just don't
6  remember their names.
7  Q. Just don't recall, all right. What type of
8  work did you do for Crown Services?
9  A. I did graphic arts.
10 Q. Is it possible to be more specific?
11 A. Sure. I did ad layouts for them, Yellow
12 Page ads. Basically just advertising flyers for
13 them.
14 Q. Do you recall what period of time you did
15 work for Crown Services?
16 A. Again, I'm not sure of the years. I don't
17 remember exactly what years it was.
18 Q. Do you know how long you did work for Crown
19 Services?
20 A. Maybe two years.
21 Q. Do you know if they're still in business?
22 A. Yes, they are.
23 Q. Do you do any work for them currently?
24 A. No, I don't.

Page 30

1  Q. Do you recall when you last did any work for
2  Crown Services?
3  A. Again, I don't remember the exact year.
4  Somewhere in the '90's.
5  Q. Is it Wellesley Publications, is that the
6  name?
7  A. Yes.
8  Q. What type of business are they?
9  A. They produce a bimonthly real estate
10 magazine.
11  Q. What type of work did you do for them?
12  A. I checked their ads that are submitted for
13 publication and provide art services and any graphic
14 arts that they might need.
15  Q. Are you currently doing -- do you know if
16 Wellesley Publications are still in business?
17  A. Yes, they are.
18  Q. Are you currently doing work for them at
19 all?
20  A. Yes, I am.
21  Q. Have you done work for them fairly
22 consistently since the early 1980's?
23  A. Again, they're a bimonthly magazine. Every
24 other month I would do a few things for them.

Page 31

1  Q. Have they been a consistent customer of
2  Gavin Studios since the time you first started doing
3  work for them?
4  A. Yes.
5  Q. When I say you're doing work for them, is
6  that under the name Gavin Studios?
7  A. Yes.
8  Q. The same thing for Crown Services, was that
9  work done under the name --
10  A. Yes.
11  Q. Just wait until I finish the question.
12  A. Sorry.
13  Q. Under the name Gavin Studios?
14  A. Yes.
15  Q. Did Gavin Studios send invoices to both
16 Crown Services and Wellesley Publications for that
17 work?
18  A. Yes.
19  Q. Were those invoices paid?
20  A. Yes.
21  Q. Is the billing to Wellesley Publications, is
22 that done on a -- what's the basis on which -- let
23 me strike that and re-ask the question.
24      Was there an agreed upon fee? Is there

Page 32

1  an agreed upon fee with Wellesley Publications for
2  the work you do for them?
3  A. Yes.
4  Q. Is that a flat rate or an hourly rate?
5  A. It's an hourly rate.
6  Q. You're not an employee of Wellesley
7  Publications, correct?
8  A. No.
9  Q. You're not -- at any time have you been?
10  A. No.
11  Q. Same question for Crown Services --
12  A. No.
13  Q. -- have you ever been an employee of them?
14  A. Sorry, I interrupted you.
15  Q. That's okay. The answer is no?
16  A. No.
17  Q. Does Gavin Studios have records -- let me
18 ask a question before that.
19      Records relating to Gavin Studios, where
20 are those kept?
21  A. Where are they kept? They're at my home.
22  Q. Do you have records for the work you've done
23 for Wellesley Publications and Crown Services?
24  A. Yes.

Page 33

1  Q. Sitting here today, do you know the dollar
2  volume of work you have done for Wellesley
3  Publications?
4      MR. WILGOREN: From inception?
5  Q. Let me ask the last year, do you know how
6  much work you've done for Wellesley Publications?
7  A. Last year?
8  Q. Yes.
9  A. Yes, I do know.
10  Q. What is that amount?
11  A. Approximately.
12  Q. Yes.
13  A. Four thousand dollars.
14  Q. Do you recall your hourly rate currently for
15 Wellesley Publications?
16  A. Yes.
17  Q. What is that?
18  A. 60 dollars.
19  Q. Has that hourly rate changed over the course
20 of the time you've done work for Wellesley
21 Publications?
22  A. Yes.
23  Q. Has the annual income -- is the annual
24 amount that's been billed to Wellesley Publications,


William J. Gavin

Page 34

1  has that remained about the same since you began
2  doing work for them?
3      A. I'm not sure of that question again.
4      Q. Sure. Your testimony was that you did
5  approximately four thousand dollars worth of work
6  for Wellesley Publications in the last year; is that
7  correct?
8      A. Correct.
9      Q. Has that number been constant since the time
10 you first started doing work for Wellesley
11 Publications?
12     A. You mean the amount?
13     Q. Yes.
14     A. No, it varies.
15     Q. Okay. Has the number of hours changed --
16 no, let me ask that the other way. Has the number
17 of hours you worked for Wellesley Publications per
18 year, has that remained fairly constant since you
19 started doing work for them?
20     A. No.
21     Q. It fluctuates as well?
22     A. Yes.
23     Q. Sitting here today, do you have any idea as
24 to the amount of work, number of hours you devoted

Page 35

1  to work for Crown Services?
2          MR. WILGOREN: When?
3      Q. The total length of time you worked for
4  Crown Services.
5      A. I can't put a number on that.
6      Q. Would you have records at home that would
7  show that?
8      A. I believe so.
9      Q. Other than those two businesses which you
10 identified, do you recall any other businesses that
11 you've done work for as Gavin Studios, other than
12 Honeywell?
13     A. No major businesses.
14     Q. No major businesses? Okay. Do you recall
15 any minor businesses?
16     A. Yes.
17     Q. Who is that?
18     A. The names of the businesses?
19     Q. If you recall.
20     A. Again, if I can clarify. Some of these were
21 just one-time jobs.
22     Q. Okay.
23     A. Hopkinton, I think, Education Foundation I
24 believe was one.

Page 36

1      Q. Actually, let me show you a document.
2          MR. DONOGHUE: Actually, can you mark
3  that as Exhibit 1, first.
4          (Exhibit 1 marked for identification)
5          (Document exhibited to witness)
6      Q. Mr. Gavin, I've placed a document in front
7  of you, which has been marked as Exhibit 1, and ask
8  you if you've seen that document before?
9      A. Yes.
10     Q. Could you tell us what that is?
11     A. It is a resume of myself.
12     Q. Did you prepare that resume?
13     A. I did.
14     Q. The document that was handed to you has
15 three pages. Do you recognize the second and third
16 pages?
17     A. Yes.
18     Q. What are those?
19     A. Those are copies -- prints of work that I
20 had done for Bull.
21     Q. Were those attached to the resume?
22     A. They were not.
23     Q. They were not, okay. Do you know when you
24 prepared Exhibit 1?

Page 37

1      A. The first page?
2      Q. Yes.
3      A. Judging by the client list here, it was
4  probably around 2000.
5      Q. Do you recall that you prepared the first
6  page of Exhibit 1 at the time you were still
7  performing services for Bull?
8      A. Yes.
9      Q. What was the purpose of creating the first
10 page of Exhibit 1?
11     A. To acquire more work.
12     Q. Did you distribute the first page of Exhibit
13 1?
14     A. When it was asked for, yes.
15     Q. Is your resume, the first page of Exhibit 1,
16 is that also available on the Gavin Studio website?
17     A. Yes.
18     Q. In fact, there's a reference to the website
19 at the heading of the first page, correct?
20     A. Correct.
21     Q. Does Gavin Studios still maintain that
22 website?
23     A. Yes.
24     Q. Do you know when that website was created by

Page 38

1  Gavin Studio?
2     A. I don't remember the exact date.
3     Q. Can you give an approximate date at all?
4     A. Probably around 1991, '92.
5     Q. The second and third pages of Exhibit 1, I
6  think you described them as examples of work you've
7  done for Bull; is that correct?
8     A. That's correct.
9     Q. Are those samples contained on the Gavin
10 Studio website?
11    A. They are.
12    Q. Is one of the reasons you maintain a Gavin
13 Studio website to create work for Gavin Studio?
14    A. Yes.
15    Q. I'll ask you a couple of questions about the
16 resume, page one. There's a reference to two
17 websites about a third of the way down. One for
18 www.ceoexchange.com and one for
19 wwwtherealestatepro.com. Do you see those two
20 references?
21    A. Yes.
22    Q. And it says built and maintained, correct?
23    A. Correct.
24    Q. What does that mean?

Page 39

1     A. That means I created the information
2  pages -- not the information, I'm sorry. Created
3  the pages that are on those websites.
4     Q. Was that done for clients of Gavin Studio?
5     A. Yes.
6     Q. Who is the client for CEO exchange dot com?
7     A. CEO exchange is the name of the client.
8     Q. And the same question for the real estate
9  pro.
10    A. The real estate pro is the real estate
11 professional magazine.
12    Q. Do you recall when -- is that one of
13 Wellesley Publications magazines?
14    A. Correct.
15    Q. Do you recall when you built either of those
16 websites?
17    A. I'd have to look at my records to find the
18 exact date. Probably four years ago.
19    Q. Approximately 2002?
20    A. Probably before that. I'm guessing. I'm
21 not sure exactly what date it was.
22    Q. Do you recall whether you created those
23 websites while you were still performing service --
24 providing services to Bull?

Page 40

1     A. Yes.
2     Q. You did create them?
3     A. I did create those.
4     Q. And you have records that would show when
5  those were created?
6     A. Yes.
7     Q. Above that there's a reference to software
8  experience. Where did you get the experience with
9  the various types of software that are listed?
10    A. I was self-taught.
11    Q. Was that over a course of a period of time?
12    A. Yes.
13    Q. There's a reference to clients further down
14 on the page one of Exhibit 1. I'll ask you to look
15 at that and see if that refreshes your memory as to
16 some other clients of Gavin Studios.
17    A. Yes, they do.
18    Q. Do you have records that would show what
19 type of services you provided for each of those
20 companies during what time period?
21    A. Some of them.
22       MR. WILGOREN: Objection.
23    A. Sorry.
24       MR. WILGOREN: Hasn't been established

Page 41

1  they were clients of Gavin Studios.
2        MR. DONOGHUE: All right, well --
3     Q. Are those clients of Gavin Studios?
4     A. Are they, is that --
5     Q. I'll ask it two different ways. There's a
6  list that says partial list of clients, correct, on
7  page one?
8     A. Correct.
9     Q. At some point were all those companies
10 listed a client of Gavin Studios?
11    A. When you say client, you mean on-going
12 client or --
13    Q. Well, at any time were those companies
14 listed a client of Gavin Studios?
15    A. Yes.
16    Q. Are any of them current clients of Gavin
17 Studios?
18    A. Yes.
19    Q. Who is a current client?
20    A. Wellesley Publications.
21    Q. Anyone else?
22    A. No.
23    Q. It says partial list of clients. Are there
24 other clients -- have there been other clients of

William J. Gavin

Page 50

1  technical illustrator for a period of time?
2      A. Yes.
3      Q. For how long?
4      A. Forever.
5      Q. Okay. Well, all right, then.
6      A. That was still part of the job.
7      Q. So that part of your job never changed, is
8  that what you're saying?
9      A. Never changed.
10     Q. At the time you were hired in 1975, were you
11 hired as an employee?
12     A. Yes.
13     Q. Where did you work?
14     A. In Waltham, Massachusetts.
15     Q. Do you recall your pay rate at that time at
16 all?
17     A. Yes.
18     Q. What was it?
19     A. What I was offered or what I actually got?
20     Q. Okay. If there's two different numbers, why
21 don't you tell me what you were offered.
22     A. I answered the ad for four dollars and 65
23 cents an hour.
24     Q. Okay. What did you actually start at?

Page 51

1      A. Four dollars and 45 cents an hour.
2          MR. WILGOREN: Off the record.
3          (Discussion off the record)
4      Q. At some point you left Honeywell?
5      A. Yes.
6      Q. When was that?
7      A. The exact date is -- I'm not sure of the
8  exact date, but it was 1979. No, sorry, let me
9  think. I believe it was '79.
10     Q. All right.
11     A. Yes, yes.
12     Q. Sometime during that year?
13     A. Yes.
14     Q. Why did you leave Honeywell at that time?
15     A. I left because -- honestly, to change my
16 job. And my mother had died, and I was living at
17 home.
18     Q. When you left Honeywell, did you go to work
19 for another employer?
20     A. No.
21     Q. Do you recall what your pay rate was when
22 you left Honeywell in '79?
23     A. No, I don't.
24     Q. Do you recall if you got a raise from the

Page 52

1  4.45?
2      A. I assume I did.
3          MR. WILGOREN: Don't assume.
4      A. I'm sorry, don't assume.
5      Q. But you don't have any memory?
6      A. I don't have a memory, no.
7      Q. Fair enough. At some point you returned to
8  perform services at Honeywell, correct?
9      A. Yes, correct.
10     Q. When was that?
11     A. 1979.
12     Q. Why did you return?
13     A. John Haskell called me and asked me if I
14 could do a couple of jobs for him.
15     Q. At that time, between the time you left and
16 the time Mr. Haskell called you, were you providing
17 services for anyone at all, whether as an employee
18 or otherwise?
19     A. No.
20     Q. Could you identify who Mr. Haskell is?
21     A. Mr. Haskell ran the technical illustration
22 department.
23     Q. Was that the department you worked at before
24 you left Honeywell in '79?

Page 53

1      A. When I first came -- I have to clarify this.
2      Q. Sure.
3      A. When I first came to the company, there were
4  three art departments.
5      Q. Okay.
6      A. I was in one, which mainly took care of
7  in-house. There was another art department, which
8  was John Haskell's art department, which did all the
9  technical illustration and manuals. Then there was
10 another art department that just handled PR, outside
11 work. So I transferred from the first art
12 department to John Haskell's department. And then
13 in that time frame I left.
14     Q. How long had you been working in
15 Mr. Haskell's department before you left in 1979?
16     A. I'm not sure. Maybe a year.
17     Q. So you said Mr. Haskell called you and asked
18 you to do a couple of projects; is that correct?
19     A. That's correct.
20     Q. That was also in calendar year 1979?
21     A. Yes.
22     Q. You weren't employed at all in the interim,
23 between the time you left and the time you came
24 back?

14 (Pages 50 to 53)

Page 54

1  A. Correct.
2  Q. How long a period of time was that?
3  A. I'm not sure exactly. No more than a few
4  months.
5  Q. Did Mr. Haskell call you on the phone?
6  A. Yes.
7  Q. Do you recall what he said?
8  A. I don't remember his exact words.
9  Q. Did you in fact enter into a relationship
10  with Honeywell after that conversation? Yes, after
11  that conversation.
12  A. Yes, yeah.
13  Q. Did you have any discussions with
14  Mr. Haskell before you returned to work?
15  A. Only when he called me to come in.
16  Q. Did he tell you the types of projects?
17  A. It was the same work.
18  Q. When you say "the same work," what do you
19  mean?
20  A. The work that I was working on when I left
21  was the same work that I worked on when I came back.
22  Q. You said Mr. Haskell's department was
23  responsible for technical illustrating; is that --
24  do I have that correct?

Page 55

1  A. Yes.
2  Q. What is that used for, if I may ask?
3  A. It was more than technical illustration.
4  Illustration was part of it. It was pasting up and
5  producing camera ready artwork for their tech
6  manuals, product briefs. Anything that the company
7  used for publication for themselves.
8  Q. But that's internal publication?
9  A. Internal publications.
10  Q. You said there were a couple of projects he
11  wanted you to work on, correct?
12  A. Correct.
13  Q. Those weren't projects you had been working
14  on prior to the time you left; is that fair to say?
15  A. Not the same projects, no.
16  Q. What was the relationship upon your return
17  to work for Honeywell?
18      MR. WILGOREN: Objection.
19      MR. DONOGHUE: I'll withdraw the
20  question and re-ask the question.
21  Q. At the time you left Honeywell in 1979, you
22  were an employee, correct?
23  A. Yes.
24  Q. When you came back, were you an employee?

Page 56

1      MR. WILGOREN: Objection. Calls for
2  legal conclusion.
3  Q. Were you classified as an employee?
4  A. I'm not sure how they classified me.
5  Q. How did you get paid?
6  A. By check.
7  Q. Was it payroll check?
8  A. It was a company check.
9  Q. Do you know if it was a payroll check?
10  A. I have no idea.
11  Q. Do you know if there were tax deductions
12  taken out of the check?
13  A. Oh, there were no tax deductions.
14  Q. Did you have any discussion with Mr. Haskell
15  as to the basis upon which you would be returning to
16  Honeywell?
17  A. I'm not sure what you mean.
18  Q. At the time you left, you were an employee,
19  correct?
20  A. Correct.
21  Q. You came back. Did you have an
22  understanding at all that your status was different?
23      MR. WILGOREN: Objection.
24  A. Different in the sense that I wasn't an

Page 57

1  employee.
2  Q. Okay.
3  A. At least in their eyes.
4  Q. You had that understanding when you came
5  back?
6  A. Yes.
7  Q. How did you have that understanding?
8  A. I'm not sure -- how did I have an
9  understanding?
10  Q. Okay, did Mr. Haskell tell you that before
11  you returned?
12  A. He didn't tell me anything, really.
13  Q. How did you learn that you were no longer
14  considered by Honeywell to be an employee?
15  A. They created purchase orders.
16  Q. All right. Who were those purchase orders
17  directed to?
18  A. To me.
19  Q. Personally?
20  A. To the company.
21  Q. Which company?
22  A. Gavin Studio -- Gavin Associates at the
23  time.
24  Q. Somehow you had to know about Gavin

Page 58

1  Associates, correct?
2  A. I'm not sure I know what you mean. How I
3  had to know. He, John Haskell created it.
4  Q. But he told you about it?
5  A. Yes.
6  Q. What did he say?
7  A. He said I'm going -- we're going to give you
8  this name, Gavin Associates.
9  Q. Did he tell you --
10 A. And I will bill against it or bill.
11 Q. Did he tell you, you would have purchase
12 orders in Gavin Associates' name?
13 A. He didn't tell me. He just produced them.
14 Q. Did you send invoices to Honeywell from
15 Gavin Associates?
16 A. Yes.
17 Q. How did you come to do that?
18 A. I was instructed to.
19 Q. By who?
20 A. John Haskell.
21 Q. When Mr. Haskell advised that you would be
22 paid on a purchase order, did he also advise you
23 that the company considered you to be a contractor?
24 A. He didn't really specify, that I remember.

Page 59

1  Q. Was that your understanding of how the
2  company perceived you?
3  A. At the time, yes.
4  Q. It was. Okay. So you knew when you went
5  back to work in '79 that the company was treating
6  you as an independent contractor?
7  A. Yes.
8  Q. And you got paid a check based on a purchase
9  order, correct?
10 A. Yes.
11 Q. And there were no taxes taken out of that
12 check?
13 A. Correct.
14 Q. In fact, were there any deductions at all
15 taken out of the check?
16 A. No.
17 Q. Were you familiar with employee benefits
18 that the company had provided its employees prior to
19 the time you left Honeywell in 1979?
20 A. Just from what I learned when I was -- my
21 first -- became employed with the company in '75.
22 Q. But you had worked there almost four years,
23 correct?
24 A. '75, '76 -- approximately.

Page 60

1  Q. During that time, were you aware of the
2  company's vacation policy?
3  A. Yes.
4  Q. And you were aware of any retirement benefit
5  funds the company had?
6  A. What was in the manual, yes.
7  Q. You received manuals at the time you started
8  working?
9  A. Yes.
10 Q. And you were aware of the company's health
11 insurance program at the time?
12 A. Yes.
13 Q. Before you left the company in '79, were you
14 participating in the health insurance program?
15 A. I honestly don't remember.
16 Q. Were you participating in any other
17 insurance programs that the company had before then?
18 A. No.
19 Q. Is that a no or you don't know?
20 A. No, I don't believe so.
21 Q. What else do you recall about the company's
22 benefit program at the time you became an employee
23 in '75?
24 A. I don't recall anything else.

Page 61

1  Q. Now, when you rejoined the company at
2  Mr. Haskell's request in '79, you understood that
3  the company was not considering you an employee at
4  that time; is that correct?
5  A. That's correct.
6  Q. And you knew that you weren't, in the
7  company's eyes, eligible for vacation time; is that
8  correct?
9  A. Correct.
10 Q. You knew that you also were not eligible for
11 participation in the company's health insurance
12 program at that time, correct?
13 A. Correct.
14 Q. And did you also know that you were not
15 considered a participant in the company's retirement
16 benefit plans at that time?
17    MR. WILGOREN: Objection. Are you
18 asking from the company's point of view with respect
19 to all these questions?
20    MR. DONOGHUE: Let me withdraw the
21 question and re-ask it to make sure we're clear.
22 Q. When you returned in '79, you understood the
23 company did not consider you to be eligible for
24 participation in its retirement plans; is that

Page 62

1  correct?
2    A. Correct.
3    Q. Was it your understanding when you came back
4  at Mr. Haskell's request in 1979 that you were not
5  considered a participant in any of the company's
6  employee benefit programs?
7    A. Correct.
8    Q. So you did understand that at that time?
9    A. That's what I believed, yes.
10   Q. Do you recall, when you first returned and
11 you were working on these projects, was there an
12 hourly rate? Well, strike that.
13       What was the basis of your payment?
14   A. It was based on an hourly rate.
15   Q. What was the hourly rate, if you recall at
16 that time?
17   A. I believe we stated it was like seven
18 dollars and something an hour somewhere.
19   Q. Do you recall if it was a higher rate than
20 the rate you had been paid when you were an
21 employee?
22   A. No.
23   Q. Do you recall what the rate was that you
24 were paid at, at the time you left employment in

Page 63

1  early 1979?
2    A. I don't really remember.
3    Q. But you don't have any memory one way or
4  another as to whether, let me make sure I finish the
5  question, as to whether the rate you were paid upon
6  your return was different than the rate you were
7  paid upon your departure?
8    A. I don't recall.
9    Q. You submitted invoices from Gavin Associates
10 at first?
11   A. Correct.
12   Q. How frequently did you submit invoices?
13   A. After a job was completed.
14   Q. When you first returned to provide services
15 for Honeywell at Mr. Haskell's request, how many
16 hours did you spend on the projects that he asked
17 you to come back to work on?
18   A. They varied from job to job.
19   Q. Was it full time?
20   A. Yes -- not at first it wasn't, no.
21   Q. Regardless of the length of each particular
22 project, you sent an invoice under Gavin Associates'
23 name for each project?
24   A. Not for each project.

Page 64

1    Q. How did you send the invoices?
2    A. Per purchase order.
3    Q. Per purchase order, okay. Were purchase
4  orders and projects not the same thing?
5    A. No, they weren't.
6    Q. Was there one purchase order per project or
7  how did that work?
8    A. No, it depended on the job. Usually
9  whatever they could fit on it.
10   Q. Would you know the amount of the purchase
11 order before you began providing services?
12   A. No.
13   Q. Are you familiar with a company known as
14 Sullivan & Cogliano?
15   A. Yes.
16   Q. Did you have any sort of relationship with
17 them at all?
18   A. Yes.
19   Q. What was that relationship?
20   A. I was asked by John Haskell to go through
21 Sullivan & Cogliano so they could provide pay
22 through them by way of Honeywell to --
23   Q. Go ahead.
24   A. To -- the reasoning being they could not

Page 65

1  hire me back directly for one year. So I had to go
2  through an agency.
3    Q. When you say "the reasoning," was that what
4  Mr. Haskell told you?
5    A. Yes.
6    Q. Do you recall specifically what he said?
7    A. Basically what I said. I don't know the
8  exact words, but that company's policy was not to
9  re-hire people for one year after they leave on
10 their own.
11   Q. At the time you had that conversation, did
12 you understand that Honeywell was proposing to bring
13 you back as an independent contractor?
14   A. Again, time frame, I was not aware of how
15 long this was going to go on.
16   Q. I'm not sure that -- you indicated that
17 Mr. Haskell told you that because of a company rule
18 as to bringing people back within a year, you had to
19 be employed or work through Sullivan & Cogliano,
20 correct?
21   A. Correct.
22   Q. At the time of that discussion, was it your
23 understanding that Mr. Haskell was proposing to
24 bring you back as an independent contractor?

17 (Pages 62 to 65)

Page 66

1  A. During that time or --
2  Q. Yes.
3  A. Yes.
4  Q. How long did you actually do work for
5  Honeywell through Sullivan & Cogliano?
6  A. Approximately one year.
7  Q. During the time you were providing services
8  through Sullivan & Cogliano, had Gavin Associates
9  been created by then?
10 A. Yes.
11 Q. Were you sending invoices --
12 A. Oh, excuse me. No, they were not created by
13 then.
14 Q. I just want to get the chronology right.
15 Did you end up providing services through Sullivan &
16 Cogliano?
17 A. To Honeywell, yes.
18 Q. Yes, okay. Was Sullivan & Cogliano treating
19 you as an employee or as an independent contractor?
20 A. I believe an employee.
21 Q. Do you have any memory of that at all?
22 A. They withheld taxes, if that's what you
23 mean.
24 Q. Okay. At some point you stopped becoming --

Page 67

1  you stopped providing services through Sullivan &
2  Cogliano, correct?
3  A. Correct.
4  Q. Is that the time when Gavin Associates came
5  into being?
6  A. Yes.
7  Q. For how long -- your testimony was that was
8  approximately a year after you returned to
9  Honeywell?
10 A. Yes.
11 Q. So is it fair to say that was approximately
12 1980?
13 A. It's fair to say, yes.
14 Q. So was Gavin Associates created in 1980,
15 approximately?
16 A. Approximately.
17 Q. How long was it before Gavin Associates
18 became Gavin Studio?
19 A. Again, I'm not sure exactly, but it
20 wasn't -- I don't remember what I answered awhile
21 ago.
22 Q. Other than the name change, was there any
23 other change when Gavin Associates became Gavin
24 Studios?

Page 68

1  A. Change in what respect?
2  Q. In any respect, other than the name change.
3  A. No.
4  Q. Do you receive any benefits as an employee
5  of Sullivan & Cogliano?
6  A. I believe they had an employee policy of
7  providing vacation days, but I never got to that
8  point.
9  Q. You weren't there long enough?
10 A. Correct.
11 Q. Now, how about health insurance or any other
12 benefits?
13 A. I don't remember.
14 Q. Other than changing from the relationship to
15 providing services through Sullivan & Cogliano when
16 you began providing services through Gavin
17 Associates, was there any other change in terms of
18 the services you provided to Honeywell?
19 A. No.
20    MR. DONOGHUE: Can I take about two
21 minutes?
22    MR. WILGOREN: Why don't we take about
23 five minutes.
24    (Whereupon, a recess was taken)

Page 69

1  Q. Mr. Gavin, I should have mentioned this
2  before. When we take breaks, you realize when we
3  come back, you're still under oath? You understand
4  that?
5  A. I understand.
6  Q. When you came back to Honeywell in '79, were
7  your projects assigned to you by Mr. Haskell?
8  A. Yes.
9  Q. Were they assigned to you on a
10 project-by-project basis?
11 A. It varied.
12 Q. Okay. Explain the variation to me, then.
13 A. There was a job pile. Again, they were
14 doing numerous publications of various types, tech
15 manuals and product briefs. And when they were
16 ready to be pasted up, they would end up in a pile.
17 If you had something -- if you had a free moment,
18 like you completed another job, you would just grab
19 the next one.
20 Q. Did you have any sort of a formal
21 description of your work position or your job at
22 that point?
23 A. Not that I recall.
24 Q. Were there other people at the time --

18 (Pages 66 to 69)

Page 82

1  A. It was after I inquired about -- after I
2  spoke with my lawyer, Michael Romaneau.
3  Q. Prior counsel?
4  A. Yes.
5  Q. Was that sometime in 2002?
6  A. Yes.
7  Q. Did you type this up and prepare it
8  yourself?
9  A. I did.
10 Q. I'm going to ask you a couple of questions
11 about it. The first page there's a reference to
12 Sullivan & Cogliano; do you see that?
13 A. I do.
14 Q. Does that reflect the dates that you
15 provided work to -- or provided services for
16 Honeywell through Sullivan & Cogliano?
17 A. Yes.
18 Q. So is it fair to say that, that relationship
19 ended in June of 1979?
20 A. Yes.
21 Q. Is it fair to say it began in June of 1978?
22 A. Yes.
23 Q. The information you have when you provided
24 services through Sullivan & Cogliano has the number

Page 83

1  of hours of work as well as the total amount paid,
2  correct?
3  A. Correct.
4  Q. Does that refresh your memory at all as to
5  what you were paid on an hourly basis during the
6  time you provided services through Sullivan &
7  Cogliano?
8  A. Well, I would need a calculator to figure it
9  out.
10 Q. 224 divided by 32, would that yield the
11 hourly rate?
12 A. I would presume so, yes.
13 Q. Was that a rate that you had discussed with
14 Mr. Haskell at all?
15 A. No.
16 Q. How was that rate determined?
17 A. Yes, excuse me, John Haskell and I did
18 discuss it, and Sullivan & Cogliano had a higher
19 rate. And of course through their company policy,
20 they retained some of the pay for themselves as a
21 commission.
22 Q. Oh, okay. So Honeywell was paying, to your
23 knowledge, was paying Sullivan & Cogliano an
24 overhead fee for providing the services?

Page 84

1  A. Yes.
2  Q. The figures in Exhibit 2, does that reflect
3  the amounts you received?
4  A. That I received, yes.
5  Q. Is that before taxes?
6  A. I'd have to look at the pay stubs to be
7  sure. I don't remember.
8  Q. Further on down the page, there is a
9  reference to Gavin Associates, correct?
10 A. Correct.
11 Q. Does that reflect that your services to
12 Honeywell began to be provided under the name Gavin
13 Associates?
14 A. That reflects the PO date, the invoice date,
15 yes.
16 Q. I notice there's some overlap between the
17 beginning date of Gavin Associates and ending date
18 of Sullivan & Cogliano. Would you agree with that?
19 A. Yes.
20 Q. Do you know why that is?
21 A. The Sullivan Cogliano dates were the dates I
22 was paid, not the date that I was working.
23 Q. Okay. Do you recall how long a lag time
24 there was between the date that you provided the

Page 85

1  services and the date that Sullivan & Cogliano paid
2  you?
3  A. I don't recall.
4  Q. Do you recall there being a time when you
5  were providing services to Honeywell during the same
6  work week under both Sullivan & Cogliano and Gavin
7  Associates?
8  A. I was not.
9  Q. If you turn to page 2 of Exhibit 2, there is
10 a reference at 6/16/80. There's a remark, "move to
11 Millis." Do you see that?
12 A. Yes.
13 Q. Is that when you moved to Millis?
14 A. Yes, it is.
15 Q. Did Gavin Associates move with you?
16 A. Gavin Studio moved with me.
17 Q. It was Gavin Studio at that time. Do you
18 know when it changed from -- let me ask you this. I
19 know I've asked you that question. Does looking at
20 Exhibit 2 help you determine when Gavin Associates
21 became Gavin Studio?
22 A. No, it does not.
23 Q. I notice on 3/2/81, there's a reference to
24 married.

22 (Pages 82 to 85)

William J. Gavin

Page 90

1  Gavin Studio?
2  A. Yes.
3  Q. Is she employed full time anywhere?
4  A. No.
5  Q. Does she work anywhere other than Gavin
6  Studio?
7  A. No.
8  Q. Are you employed anywhere -- are you working
9  anywhere other than Gavin Studio?
10 A. No.
11 Q. I asked you whether Mrs. Gavin had performed
12 services for Honeywell or Bull through Gavin
13 Studios, and I believe you testified yes.
14 A. Yes.
15     MR. WILGOREN: Objection.
16 Q. Was that before or after she ceased being an
17 employee of Honeywell?
18 A. Both.
19 Q. As an employee, at the time you were
20 married, was she a full-time employee at that time?
21 A. No.
22 Q. Do you know if she was receiving -- she was
23 an employee, though, correct?
24 A. Yes.

Page 91

1  Q. She was not a contractor?
2  A. Correct.
3  Q. How did you know that?
4  A. She told me.
5  Q. All right. Were you aware as an employee of
6  what benefits she was receiving as an employee?
7  A. Yes.
8  Q. Was she participating in the company's
9  health insurance program?
10 A. Yes.
11 Q. And you were aware of this, correct?
12 A. Yes.
13 Q. At the time you were married, did you then
14 become covered under the health insurance program?
15 A. Yes.
16 Q. Did that continue as long as she was
17 employed by the company?
18 A. Correct.
19 Q. Were you familiar with the other employee
20 benefits she was receiving for Honeywell?
21 A. Yes.
22 Q. She received vacation time?
23 A. Yes.
24 Q. And you knew that, correct?

Page 92

1  A. Yes.
2  Q. And you knew that you were not deemed by the
3  company to be eligible for that; is that correct?
4  A. I believe that.
5  Q. You knew that was the company's position?
6  A. Yes.
7  Q. How about were you familiar with the
8  retirement benefits program through your wife's
9  employment?
10 A. Yes.
11 Q. And you knew you weren't covered by that
12 program, correct?
13 A. Yes.
14 Q. At least in the company's view?
15 A. In the company's perception.
16 Q. The same with the other benefit programs,
17 did you understand the difference between the
18 benefits she received as an employee and your
19 situation as a contractor?
20 A. Yes.
21 Q. If you move further down the second page of
22 Exhibit 2, there's a reference to a new rate of 15,
23 it says in approximately January of '82?
24 A. Yes.

Page 93

1  Q. What does that indicate?
2  A. That indicated a new rate, pay rate.
3  Q. That's an hourly rate?
4  A. Hourly rate.
5  Q. That's the hourly rate you were invoicing
6  Honeywell for?
7  A. From that time, yes.
8  Q. Do you recall what the rate was before that?
9  A. I don't remember exactly.
10 Q. Now, as of January of '82, was Mrs. Gavin
11 still employed at Honeywell?
12 A. At that time?
13 Q. Yes.
14 A. No, she was not.
15 Q. At the time you were married, do you recall
16 what her hourly rate was?
17 A. I don't remember.
18 Q. At the time your new rate was 15 dollars, do
19 you know what the hourly pay rate was for the
20 graphic artists who were employees at Honeywell?
21 A. No, we never knew.
22 Q. Did not know?
23 A. Did not know.
24 Q. But that's a position that your wife had

24 (Pages 90 to 93)

### Page 94

1  held prior to the -- prior to the time she was laid
2  off by the company, correct?
3     A. Position she held --
4     Q. She was a graphic artist, correct?
5     A. Yes, she was a graphic artist.
6     Q. I think I asked you if you recall what your
7  wife's rate of pay was at the time she was laid off?
8     A. I don't recall.
9     Q. But at some point would you have known that
10 figure?
11    A. At some point I would, yes.
12    Q. You just don't recall it now?
13    A. I don't recall.
14    Q. Did Mrs. Gavin work in the same department
15 that you were working in?
16    A. Yes.
17    Q. Who was the supervisor of the department
18 during that time?
19    A. John Haskell.
20    Q. Mr. Haskell, okay. I believe you testified
21 that Mrs. Gavin had also done work for Honeywell
22 through Gavin Studio; is that correct?
23    A. Correct.
24    Q. You indicated some of that had occurred

### Page 95

1  while she was employed by Honeywell?
2     A. Yes.
3     Q. What was the nature of the work she did
4  through Gavin Studio while she was employed by
5  Honeywell?
6     A. At times there would be work overload, and
7  John Haskell would allow me to take some work home
8  on the weekends or if a job had to be done for the
9  next day, and we would get it done and bring it
10 back.
11    Q. That was invoiced by Gavin Studio to the
12 company?
13    A. Yes.
14    Q. I think your testimony was that the invoices
15 sent by Gavin Studio don't indicate who does the
16 work?
17    A. Correct.
18    Q. So is it fair to say it would not indicate
19 on that invoice whether you or Mrs. Gavin had done
20 the work?
21    A. Correct.
22    Q. To your knowledge, was Mr. Haskell aware
23 that Mrs. Gavin was doing some of this work?
24    A. Yes.

### Page 96

1     Q. Let me move on to page three of Exhibit 2.
2  Actually, let me get back to that point. After the
3  point in which -- once Mrs. Gavin was no longer
4  employed by Honeywell, what were the circumstances
5  under which she would perform services for Honeywell
6  under the Gavin Studio name?
7     A. Again, under the same circumstances.
8     Q. Same circumstances, okay. Do you have any
9  estimate as to how many hours Mrs. Gavin performed
10 work for the company?
11    A. I don't know.
12    Q. On page three of Exhibit 2, am I reading
13 correctly that the hourly rate changed to 18 dollars
14 in approximately January of '83?
15    A. That is correct.
16    Q. How were these rates determined?
17    A. I would approach I believe at the time was
18 Peter Stravropulous. I take that back, sorry. I
19 would approach Ted Lavash on some of these, on this
20 one.
21    Q. What would you say when you approached him?
22    A. I would say I would like to increase my
23 rate.
24    Q. Was Mr. Lavash agreeable to that?

### Page 97

1     A. One time, yes.
2     Q. Was that in '83?
3     A. Yeah, I believe so.
4     Q. How about in '82, how did that increase come
5  about?
6     A. I correct myself. This one was through --
7  the new rate of 15 dollars an hour was through Ted
8  Lavash. And that was the one time that I asked or
9  told him what I would want and he said okay.
10    Q. So you asked for the 15?
11    A. I asked for the 15.
12    Q. And he agreed to it?
13    A. He agreed to it.
14    Q. What about when the amount was increased to
15 18?
16    A. I don't remember how that one came about.
17    Q. Now, the invoices that were sent to
18 Honeywell or Bull from Gavin Studio, would there be
19 any way that anyone at Honeywell or Bull could tell
20 by looking at the invoice whether the work was
21 performed by you or by Mrs. Gavin?
22    A. No.
23    Q. Did anybody else perform work for Gavin
24 Studio, other than you or Mrs. Gavin?

Page 98

1  A. No.
2  Q. Is there any way in your records or Gavin
3  Studio's records that you could show what hours were
4  done by you versus Mrs. Gavin?
5  A. No.
6  Q. Let's move to -- two pages over. There is
7  an entry on 9/4/84. Do you see that?
8  A. Yes.
9  Q. There's an entry. It says blanket PO. Can
10 you tell me what that refers to?
11 A. That refers to a PO written for X amount of
12 dollars to bill against for services rendered.
13 Q. Was that a change from the prior way that
14 the billing had been done?
15 A. Yes.
16 Q. How had it been done previously?
17 A. Previously they would itemize every job.
18 Q. The numbers, I should have asked you this
19 before, but the numbers that are beginning on page
20 one, PO number, is that the Honeywell or Bull
21 purchase order number?
22 A. That is correct.
23 Q. And January of '85, looks like the rate goes
24 up to 20 dollars; do you see that?

Page 99

1  A. I do.
2  Q. Do you know how that came about?
3  A. I believe I asked for an increase, and
4  that's what they gave me.
5  Q. Do you recall who it was that approved that
6  increase at that time?
7  A. That would have been Ted Lavash.
8  Q. Do you recall at that time as of January of
9  '85 what the hourly rate for the graphic artists who
10 were employees, do you recall what their hourly rate
11 was?
12 A. It was never discussed.
13 Q. So you don't know?
14 A. I don't know.
15 Q. In future pages there are references to
16 blanket PO. Is that the same process you previously
17 described?
18 A. That is correct.
19 Q. And at July or -- excuse me, turning over
20 the next page, September of '86, there's an
21 indication of a new rate of 21.50; do you see that?
22 A. I see that.
23 Q. Do you know how that increase came about?
24 A. I believe I asked for an increase, and

Page 100

1  that's what they gave me.
2  Q. Do you recall how much of an increase --
3  A. Oh, I do remember this one. I take that
4  back. This was given to me by James Koval.
5  Q. Who is Mr. Koval?
6  A. He was -- I'm not sure what his title was,
7  but he was above -- somewhere between Peter and me.
8  Somewhere in there.
9  Q. He was --
10 A. He was like a -- he was the manager, put it
11 that way, manager.
12 Q. Was he a level above Peter?
13 A. No, he was below Peter.
14 Q. And you had asked for an increase to that
15 amount?
16 A. I had asked for an increase, and that's what
17 he said to give me. He told them to give me a
18 dollar and a half.
19 Q. With all these new rates that are listed on
20 Exhibit 2, is it correct that once the new rate is
21 indicated, that future invoices would be billed at
22 that rate?
23 A. Yes.
24 Q. And the rate increases -- well, there's an

Page 101

1  indication, it says Honeywell Bull between '87 and
2  '88. Do you see that reference?
3  A. Yes.
4  Q. What does that mean?
5  A. Honeywell joined forces with Bull
6  Information Systems, and they used a split name.
7  Q. And your rate increased to 23 dollars in
8  April of '88?
9  A. Yes.
10 Q. Do you recall how that came about?
11 A. I don't recall exactly how it came about.
12 Q. Do you recall if you requested an increase?
13 A. All the rates were requested.
14 Q. Okay. In April of '91, the rate was
15 increased to 29 dollars?
16 A. Yes.
17 Q. And again, that was at your request?
18 A. The amount was not my request, but I had
19 requested an increase.
20 Q. What was the amount you had requested?
21 A. I didn't request an actual amount.
22 Q. Oh, okay. You just requested an increase?
23 A. Yes, and -- yes.
24 Q. And in April of '92, there was an increase

26 (Pages 98 to 101)

Page 102

1  to 35 dollars, correct?
2     A.  Yes.
3     Q.  Again, was that per your request?
4     A.  Yes.
5     Q.  Going onto the last page.  There were
6  several other increases noted there from 37 -- to 37
7  dollars, then to 40 dollars, then to 60 dollars; is
8  that correct?
9     A.  Correct.
10    Q.  Do you recall any of the specifics of the
11 increases to 37 or 40 dollars?
12    A.  I don't recall exactly how they came about.
13 These would have been asked through Peter.
14    Q.  Peter was the department supervisor at that
15 time?
16    A.  Right.
17    Q.  How about the increase to 60 dollars, do you
18 recall that at all?
19    A.  Yes, that was after I was told to sign a
20 contract agreement and after I had inquired about
21 contracts.
22    Q.  Did you actually perform work at the 60
23 dollar rate?
24    A.  Yes, I did.

Page 103

1     Q.  Did you sign a contract?
2     A.  I did, under the lawyer's direction.
3     Q.  During any of these time periods up until
4  November of '01, did you have any knowledge as to
5  the hourly rate for the graphic artists who were
6  employed by Bull?
7     A.  No.
8     Q.  Did you understand that all of you were
9  receiving more on an hourly rate as a contractor
10 than employees received?
11       MR. WILGOREN:  Objection.
12    A.  I wasn't totally sure.
13    Q.  You say you're not totally sure, do you have
14 some --
15    A.  Well, you're talking my pay compared to
16 employee's pay that were there?
17    Q.  Yes.
18    A.  Again, I don't know what the employees were
19 being paid.
20    Q.  But did you have an understanding that your
21 pay rate was higher than their pay rate?
22    A.  Again, I wasn't totally sure.
23    Q.  But it sounds like --
24    A.  Some of the employees had been there 20, 30

Page 104

1  years.  So I have no idea what they were making.
2     Q.  But did you have some reason to think that
3  your hourly rate was higher than the employee's
4  hourly rate?
5        MR. WILGOREN:  Objection, he testified
6  he didn't know what the employees were making.
7        MR. DONOGHUE:  He said he wasn't
8  completely sure.  I'm just trying to test the limits
9  of that.
10    A.  I don't know.
11    Q.  Did you ever have any discussion with any of
12 the employees who were graphic artists as to what
13 their hourly rate was?
14    A.  No, I did not.
15    Q.  Now, during the entire time that was
16 indicated by Exhibit 2, I think I've already asked
17 you questions, that when you came back to perform
18 services for the company in you believe it was '79,
19 that you knew you were an independent contractor,
20 correct?
21    A.  That's my belief.
22    Q.  Was that your understanding throughout the
23 time period reflected on Exhibit 2?
24    A.  That's what I believed.

Page 105

1     Q.  So you knew during that entire time period
2  that the company was treating you as an independent
3  contractor and not an employee, correct?
4     A.  That was my understanding.
5     Q.  And you also understood that since the
6  company considered you to be a contractor and not an
7  employee, that there were certain employee benefits
8  that the company did not think you were eligible
9  for?
10       MR. WILGOREN:  Objection.
11    Q.  Is that correct?
12    A.  Correct.
13    Q.  That was your understanding throughout the
14 entire period of time reflected by Exhibit 2,
15 correct?
16    A.  Yes, up to the point of signing the
17 contract.
18    Q.  Up until the point you signed the contract,
19 you knew that in the company's view, you were not
20 considered as a participant or eligible for their
21 employee benefit programs?
22    A.  Correct.
23    Q.  During any of that period of time from '79
24 or -- actually if you look at Exhibit 2 again, it

William J. Gavin

Page 106

1 indicates you started work for Sullivan & Cogliano
2 in '78. Do you recall if that's the actual time
3 period in which you came back to the company after
4 having left?
5     A. Came back to the company through Sullivan &
6 Cogliano?
7     Q. Yes.
8     A. It must have been shortly before that,
9 because I'm sure these are billing dates.
10    Q. At no time between, whatever the date is,
11 between the date you -- let's start at the date of
12 Gavin Associates. From the time you began providing
13 services through Gavin Associates through the time
14 you signed the contract in November of '01, you
15 understood during that entire period that you were
16 not considered an employee, correct?
17        MR. WILGOREN: By Bull?
18        MR. DONOGHUE: By Bull.
19    A. Yes.
20    Q. Or Honeywell.
21    A. Or Honeywell.
22    Q. At the time you initially worked for
23 Honeywell from approximately '75 to '78 or '79, you
24 did have familiarity with what the company's benefit

Page 107

1 policies were, correct?
2     A. Yes, through the handbook.
3     Q. And that included descriptions of the
4 retirement plan?
5     A. I don't recall what I actually read at the
6 time, but yes.
7     Q. Insurance plans?
8     A. Yes.
9     Q. And vacation and holiday policies, things of
10 that sort?
11    A. Yes.
12    Q. Have you been paying your own
13 self-employment taxes since 1979?
14    A. Yes.
15    Q. You have not, during that time, been an
16 employee of Gavin Studio, correct?
17    A. I have not been? Say that again.
18    Q. Gavin Studio does not employ you, correct?
19    A. No.
20    Q. When did you first raise with anybody at
21 Honeywell or Bull the issue as to your
22 classification as an independent contractor?
23    A. That would have been November 2001.
24    Q. Had you asked anyone before that to change

Page 108

1 your status to an employee?
2     A. No.
3     Q. Did you ask anybody at Honeywell or Bull
4 before that as to what your eligibility was for
5 employee benefits?
6     A. No.
7     Q. Who did you raise the issue with in 2001?
8     A. Cecile Ray.
9     Q. How did that come about?
10    A. When I received the contract to sign to take
11 and read over before I signed it, I went on the Web
12 and investigated employee contractor law, and I came
13 across a lot of information.
14    Q. It had never occurred to you to look at that
15 before November of 2001?
16    A. No.
17    Q. What caused you to look in that direction?
18    A. There was a lot to read in that contract,
19 and I wanted to know what I was signing and what I
20 was reading.
21        MR. WILGOREN: Can we go off the record?
22        MR. DONOGHUE: Yes.
23        (Discussion off the record)
24        (Whereupon, a recess was taken)

Page 109

1        (Exhibit 3 marked for identification)
2        (Document exhibited to witness)
3     Q. Mr. Gavin, do you have Exhibit 3 in front of
4 you?
5     A. I do.
6     Q. There's a reference in Exhibit 2 to a -- let
7 me make sure I have the correct reference here. To
8 Integris on the last page. Do you see that
9 reference?
10    A. Yes, I do.
11    Q. You refer to an agreement that you were
12 presented with. Is Exhibit 3 that agreement?
13    A. Yes.
14    Q. I call your attention to page six. There is
15 a signature there, a signature on behalf of Gavin
16 Studio. Do you see that?
17    A. Yes.
18    Q. Is that your signature?
19    A. Yes.
20    Q. Also it indicates a date of 11/8/02. Is
21 that the correct date?
22    A. That's when I signed it.
23    Q. If I call your attention back to the last
24 page of Exhibit 2, the reference to Integris states

28 (Pages 106 to 109)

William J. Gavin

Page 114

1  period you provided services to Honeywell or Bull as
2  an independent contractor, were you given the
3  opportunity to become an employee?
4      MR. WILGOREN: Objection as to form.
5   A. Was I given the opportunity at any time?
6   Q. Yes.
7   A. I was asked once to become an employee.
8   Q. When was that?
9   A. Exact date I'm not sure. It was -- Linda
10 Nidle asked me.
11  Q. Do you recall what she said?
12  A. She wanted to know if I ever considered
13 becoming an employee.
14  Q. What did you respond?
15  A. I said no, I hadn't.
16  Q. Did she ask you at that time whether you
17 were interested in becoming an employee?
18  A. Yes, she did.
19  Q. What was your response at that time?
20  A. I said I would like to know more
21 information.
22  Q. Did you ever have any subsequent discussion
23 with her about that?
24  A. I did have some -- a discussion with her.

Page 115

1   Q. When was that?
2   A. Again, I'm not sure what years. Around
3  1991.
4   Q. Can you put it in context from the first
5  discussion you had with Linda Nidle about becoming
6  an employee when you had that second discussion?
7   A. It was at the time when my rate changed.
8   Q. You're referring to Exhibit 2?
9   A. Yes. Again, this is the rate change. The
10 date is when this was billed or the PO was written,
11 it was 4/23/91. So that's approximate.
12  Q. So your recollection is the '91?
13  A. '91.
14  Q. And you indicated you had a discussion in
15 which Linda Nidle asked you if you're interested in
16 becoming an employee?
17  A. Yes.
18  Q. And you said you'd like more information?
19  A. Yes.
20  Q. And you had a follow-up discussion with
21 Linda Nidle?
22  A. Yes.
23  Q. How long after the first discussion was it
24 before the second discussion took place?

Page 116

1   A. Within a week.
2   Q. What happened in that discussion?
3   A. I was offered a pay less than I was making.
4   Q. To become an employee?
5   A. To become an employee.
6   Q. Was your understanding that if you became an
7  employee, you would be eligible for employee
8  benefits?
9   A. I would assume that, yes.
10  Q. What were they offering to pay you?
11  A. As an hourly rate?
12  Q. Yes.
13  A. 27 dollars an hour.
14  Q. What were you currently earning at that
15 point?
16  A. 29.
17  Q. What did you say?
18  A. I said no.
19  Q. Did you have any further discussion with
20 Linda Nidle at that time?
21  A. No.
22  Q. Did you ever pursue it at any other --
23  A. No.
24  Q. -- time? So you made the decision at that

Page 117

1  time that you were not interested in being
2  classified as an employee?
3      MR. WILGOREN: Objection.
4   A. Not for that pay, no.
5   Q. Do you know if other contractors were
6  offered the same opportunity at around that same
7  time?
8   A. Not that I know of.
9   Q. Were you aware at any time during the period
10 that you provided services to Honeywell or Bull as a
11 contractor of the company making an offer to
12 contractors to become employees?
13     MR. WILGOREN: Objection.
14  A. No.
15  Q. And you knew when you rejected Ms. Nidle's
16 offer to become an employee that you would continue
17 to be not eligible for the employee benefits, the
18 benefits that employees received?
19     MR. WILGOREN: Objection.
20  A. Yes, that was my understanding.
21  Q. I'm sorry, I didn't --
22  A. That was my understanding.
23     (Exhibit 5 marked for identification)
24     (Document exhibited to witness)

30 (Pages 114 to 117)

JONES REPORTING COMPANY
617-451-8900

William J. Gavin

Page 138

1  A. Yes, I do.
2  Q. Are you friends or --
3  A. Well, we chat on line. You know, we send
4  e-mails.
5  Q. Sure. Do you recall when Mr. Massa sent
6  this to you?
7  A. I don't remember exactly, but it had to be
8  after this date.
9  Q. Do you recall if it was soon after this date
10 or a long time from this date?
11 A. It was soon after this date.
12 Q. So you received this approximately June of
13 2002?
14 A. Yes.
15 Q. Had you previously been aware of anything
16 relating to the freezing of the Bull pension plan?
17 A. No.
18 Q. This was the first you heard of it?
19 A. Yes.
20 Q. Do you know what it means to freeze the
21 pension plan?
22 A. Not really. I'm still not clear after
23 reading it.
24 Q. Okay, all right.

Page 139

1        MR. WILGOREN: Actually, just to be
2  accurate, this is to terminate the frozen retirement
3  plan.
4        MR. DONOGHUE: Okay, right. Okay.
5  Q. But it refers to a frozen retirement plan,
6  correct? Is that correct?
7  A. Yes.
8  Q. Did you know -- an inference from this is
9  that the retirement plan had previously been frozen.
10 Would that have been something that you would have
11 known about?
12 A. I had heard something about the retirement
13 plan was changed at one point. Not being familiar
14 with it, I -- it never occurred to me to even try to
15 understand it.
16 Q. Returning back to your February 2002
17 discussion with Mr. Thalen, did you ask him any
18 questions about the pension plan?
19 A. I didn't ask him any questions directly
20 about the pension plan, no.
21 Q. Did he, during this discussion at all,
22 mention that the pension plan had been frozen?
23 A. No, he did not.
24 Q. I take it that you didn't -- you weren't

Page 140

1  aware at the time that the pension plan had been
2  frozen?
3  A. Correct.
4  Q. You weren't aware what that actually means?
5  A. I was not aware.
6  Q. And you also met with Mr. Thalen again in
7  March 18th of 2002, correct?
8  A. Yes.
9  Q. Is the substance of that discussion set
10 forth in page five of Exhibit 9?
11 A. Yes.
12 Q. Let me call your attention to page seven of
13 Exhibit 9, interrogatory number 11.
14 A. Okay.
15 Q. The question that is asked in that
16 interrogatory is that at any time from 1979 through
17 November 2001, did you ask Bull to withhold taxes
18 from the payments made to you for services
19 performed. Do you see that question?
20 A. Yes.
21 Q. There's not an answer to that. There's an
22 objection stated. Do you see that following that?
23 A. Yes.
24 Q. Let me ask you that question now. At any

Page 141

1  time from 1979 through November of 2001, did you ask
2  Bull to withhold taxes from the payments due you?
3  A. No.
4  Q. You were aware that they were not
5  withholding taxes, correct?
6  A. Yes, I was aware.
7  Q. Calling your attention to interrogatory
8  number 13, which is on page -- which begins on page
9  eight. This interrogatory refers to work that you
10 did for other companies outside of your normal work
11 hours for Bull; do you see that there?
12 A. Yes.
13 Q. From the 1979 period through 2001, did you
14 perform any services, graphic arts related services
15 for any entity other than through Gavin Studio?
16 A. No.
17 Q. You didn't perform any services as an
18 employee of any other entity?
19 A. As an employee, no.
20 Q. Let me move to the bottom of page 13 and
21 going over to page 14, interrogatory number 21.
22 That asks you a question about whether or not you
23 were offered the option of becoming employed in
24 Bull's contingent workforce division; do you see

36 (Pages 138 to 141)

Page 142

1  that on the top of page 14?
2      A. I see it.
3      Q. Had you ever heard the words contingent
4  workforce division before?
5      A. Yes.
6      Q. When did you hear that?
7      A. From Ted Lavash.
8      Q. When was that?
9      A. I'm not sure what year it was.
10     Q. What did you understand the contingent
11 workforce division to be?
12     A. I wasn't really sure at the time.
13     Q. Did you ask any questions about it?
14     A. I didn't ask any questions about it.
15     Q. What do you know about the contingent
16 workforce division?
17     A. That the company was changing its policy to
18 workers.
19     Q. Do you recall when that was?
20     A. No, I don't.  I don't remember the time of
21 it, what year it was.
22     Q. And your recollection was you heard it from
23 Mr. Lavash?
24     A. Yes.

Page 143

1      Q. Did you have any discussion with him about
2  your becoming employed in the contingent workforce
3  division?
4      A. No.
5      Q. Did you have any discussion with anybody
6  about that?
7      A. No.
8      Q. You've previously discussed a conversation
9  you had with Linda Nidle about becoming an employee.
10 I'm just trying to put them in context.  Was that
11 before or after your discussion with Mr. Lavash
12 about the contingent workforce division?
13     A. With Linda Nidle?
14     Q. Yes.
15     A. That was her discussion.  She left the
16 company long before this came up.
17     Q. So you had no discussion with anyone at Bull
18 about the contingent workforce division, other than
19 your discussion with Mr. Lavash?
20     A. Correct.
21     Q. Is there anything else you remember about
22 the discussion with Mr. Lavash?
23     A. It was just a passing comment.
24     Q. You didn't inquire further?

Page 144

1      A. I didn't.
2      Q. We'll go to the next exhibit.
3          (Exhibit 11 marked for identification)
4          (Document exhibited to witness)
5      Q. I show you -- I'm not going to show you.
6  You already have in front of you, Mr. Gavin, what's
7  been marked as Exhibit 11; is that correct?
8      A. Correct.
9      Q. Have you seen that document before?
10     A. Yes, I have.
11     Q. Do you know what that is?
12     A. I'm not sure what the technical term is.
13 But, yes, I know what it is.
14     Q. Is it your understanding that, that's the
15 complaint which initiated the proceedings that bring
16 us here today?
17     A. I believe so.
18     Q. Let me call your attention to page three,
19 paragraph six.
20     A. Okay.
21     Q. The second sentence of paragraph six states,
22 quote, upon information and belief, Bull
23 intentionally did this to avoid the significant
24 financial costs of providing Gavin with benefits to

Page 145

1  which he was entitled.  Close quotes at that point.
2  That refers to characterizing you as an independent
3  contractor, correct?
4      A. Yes.
5      Q. What is the basis for your belief that Bull
6  intentionally did this to avoid financial costs?
7      A. Well, my belief is that the size of the
8  company that Bull is, they would know what the legal
9  aspects of hiring someone are.
10     Q. Anything other than that?
11     A. No, I don't believe so.
12     Q. Is it your claim that the company did this
13 intentionally to deprive you of benefits?
14     A. I don't know that.
15     Q. You don't know that?
16     A. No.
17     Q. You've testified already to your leaving the
18 company and then coming back to work for Mr. -- I've
19 lost track of his name, unfortunately.
20         MS. HARRIS:  Haskell.
21     Q. Haskell, thank you.  I may have already
22 asked you this question, but when you came back, did
23 you go to work at the same desk that you worked at
24 before you left?

William J. Gavin

Page 194

1  Q. Do you follow the company's stock price at
2  all?
3  A. Not really.
4  Q. So you have --
5  A. Oh, can I take that back? My wife had
6  Honeywell stock. So in that sense, a dividend check
7  would come every once in awhile for three dollars.
8  That's the only knowledge I have.
9  Q. So you're not in a position to come up with
10 a calculation in stock options?
11 A. No, absolutely not.
12     MR. DONOGHUE: I'm going to take a
13 couple of minutes, if that's okay with you.
14     MR. WILGOREN: Sure.
15     (Whereupon, a recess was taken)
16 Q. Back to a couple of the documents. Do you
17 have Exhibit 11? Actually, no, Exhibit 9. I'm
18 sorry. My apologies.
19 A. I do.
20 Q. The figure I had asked you about, the
21 self-employment tax, do you see that on page 14?
22 A. Yes.
23 Q. Why do you put a figure representing half of
24 the self-employment tax?

Page 195

1  A. I think that's what the company's obligation
2  was.
3  Q. Interrogatory 18, which is -- goes over from
4  page 11 to page 12.
5  A. Yes.
6  Q. Actually, do you see interrogatory 18, 11
7  going on to page 12? Actually, let me ask the
8  question without referring to the interrogatory.
9  Between 1979 and January of 2002, did you ever
10 consult with a financial advisor or a consultant or
11 an accountant concerning your contractor situation?
12 A. No.
13 Q. Go back to -- bear with me while I find the
14 right interrogatory. Your discussion with Ted
15 Lavash about the contingent workforce division,
16 could you describe for us how that conversation
17 occurred?
18 A. He was leaving his cubicle. My cubicle was
19 right next to his. And he just off the cuff
20 mentioned that -- I think he came from a meeting
21 earlier or something and said that the company was
22 going to be starting a new program called CWD, and
23 that -- I don't remember his exact words, but
24 basically that all contractors were going to have to

Page 196

1  do it. I think that's what he said.
2  Q. Did you recall anything else about that
3  discussion?
4  A. He said -- I said -- he briefly described it
5  just saying, you know, they take out your taxes,
6  give you some vacation pay. And I said, "Well, I
7  don't know what that means. Doesn't sound like
8  anything good to me." That's the last I ever heard
9  of it.
10 Q. Did you ask him any questions about it after
11 that?
12 A. No.
13 Q. Was he directing his discussion to you, as
14 far as you knew, or were there others in the area as
15 well?
16 A. I think there was other people in the area,
17 but he was leaving. It was like a passing thought
18 as he was going by.
19 Q. When you say leaving, just leaving the area?
20 A. Leaving the area.
21 Q. Not --
22 A. No, he wasn't leaving the company. He was
23 walking out, and he saw me and just briefly said it.
24 Q. Do you have any form of an individual

Page 197

1  retirement account or any sort of a --
2  A. I had started an individual SEP.
3  Q. A SEP, all right.
4  A. SEP IRA.
5  Q. When did you start that?
6  A. I'm not sure of the exact dates. I'd have
7  to look at my taxes.
8  Q. It would be reflected on your taxes?
9  A. It would be on my taxes.
10 Q. Because you're taking the deduction for it?
11 A. Yeah.
12 Q. Since you've ceased providing services to
13 Bull, have you provided any services at all, other
14 than through Gavin Studios? Studio, excuse me.
15 A. Services?
16 Q. For any entity, either as an employee or
17 contractor.
18 A. Just individual jobs, like I had mentioned
19 before.
20 Q. Through Gavin?
21 A. Yes.
22 Q. Everything's through Gavin?
23 A. Everything's through Gavin Studio.
24 Q. During the time you provided services for

50 (Pages 194 to 197)