Page 154

1  year.
2  Q. You actually bought a Macintosh for your
3  home?
4  A. I did.
5  Q. Did you use that to do work for Gavin
6  Studio?
7  A. Yes.
8  Q. Had you used the Atari to do any work for
9  Gavin Studio?
10  A. Just bookkeeping.
11  Q. You couldn't do any graphic work?
12  A. No.
13  Q. Before you got the Macintosh for your home
14  to use for Gavin Studio, how would you do work for
15  clients of Gavin Studio?
16  A. Pen and ink and wax.
17  Q. Which was the standard before computers?
18  A. Standard before.
19  Q. During the time period from the time you
20  returned to the company in 1979 to early 2002, did
21  you work a set work schedule?
22  A. Set work schedule?
23  Q. Yes.
24  A. Unless they told me not to come in.

Page 155

1  Q. Okay. Would that happen that they would
2  tell you not to come in?
3  A. There were times when they said don't bother
4  coming in for a few days or whatever.
5  Q. Was there a time that you normally came in
6  to work?
7  A. Yes.
8  Q. What time is that?
9  A. Mid morning when we were in Billerica,
10  because of the distance, the traffic.
11  Q. You were coming from --
12  A. Millis.
13  Q. Millis at that time, okay. And mid morning,
14  were you given flexibility as to what time you
15  actually arrived?
16  A. It was flexible.
17  Q. How about the time of leaving?
18  A. I would try to put a full day in. Sometimes
19  I wouldn't, because there was nothing to do.
20  Q. If you had nothing to do, you could leave?
21  A. I could leave. Well, yes, that's fair to
22  say.
23  Q. Were there times when you had work to do and
24  you stayed later than an eight-hour workday?

Page 156

1  A. There were times I stayed.
2  Q. Were there times you came in earlier than
3  mid morning?
4  A. Sometimes.
5  Q. Were there times you came in later than mid
6  morning?
7  A. Sometimes.
8  Q. Could you do that as you saw fit?
9  A. I believe so, because I was given permission
10  to.
11  Q. By whom?
12  A. Sandra Richardson.
13  Q. Was she the head of the department at that
14  time?
15  A. Yes, she was.
16  Q. And you also did work at home for Honeywell
17  or Bull during this time period?
18  A. Only early years when there was an
19  overabundance of work that couldn't be done, I would
20  take -- John Haskell would let me take some slide
21  work home to work at night or weekends instead of
22  giving it to another vendor who's somewhere else off
23  site.
24  Q. But is it fair to say that after that

Page 157

1  period, you didn't do work at home, because there
2  wasn't the volume of work that required you to work
3  at home?
4  A. That's true. There just wasn't any work to
5  take home.
6  Q. Nobody told you, you couldn't do work at
7  home; is that correct?
8  A. Well, no, they didn't tell me I couldn't do
9  work at home.
10  Q. When --
11  A. Can I correct that answer? Peter had told
12  me he wanted me there, not off -- he wanted me on
13  site, not off site.
14  Q. Peter is who?
15  A. Peter is the director of communications.
16  Q. I just need his last name.
17  A. Peter Stravropulous.
18  Q. When did he tell you this?
19  A. Numerous times he told me that. One time I
20  inquired directly about doing work at home. And he
21  said, "No, I want you here in case somebody needs
22  something."
23  Q. Did he tell you that there were specific
24  hours that you needed to be there?

```
                                               Page 142
 1   that on the top of page 14?
 2       A.  I see it.
 3       Q.  Had you ever heard the words contingent
 4   workforce division before?
 5       A.  Yes.
 6       Q.  When did you hear that?
 7       A.  From Ted Lavash.
 8       Q.  When was that?
 9       A.  I'm not sure what year it was.
10       Q.  What did you understand the contingent
11   workforce division to be?
12       A.  I wasn't really sure at the time.
13       Q.  Did you ask any questions about it?
14       A.  I didn't ask any questions about it.
15       Q.  What do you know about the contingent
16   workforce division?
17       A.  That the company was changing its policy to
18   workers.
19       Q.  Do you recall when that was?
20       A.  No, I don't.  I don't remember the time of
21   it, what year it was.
22       Q.  And your recollection was you heard it from
23   Mr. Lavash?
24       A.  Yes.
```

```
                                               Page 143
 1       Q.  Did you have any discussion with him about
 2   your becoming employed in the contingent workforce
 3   division?
 4       A.  No.
 5       Q.  Did you have any discussion with anybody
 6   about that?
 7       A.  No.
 8       Q.  You've previously discussed a conversation
 9   you had with Linda Nidle about becoming an employee.
10   I'm just trying to put them in context.  Was that
11   before or after your discussion with Mr. Lavash
12   about the contingent workforce division?
13       A.  With Linda Nidle?
14       Q.  Yes.
15       A.  That was her discussion.  She left the
16   company long before this came up.
17       Q.  So you had no discussion with anyone at Bull
18   about the contingent workforce division, other than
19   your discussion with Mr. Lavash?
20       A.  Correct.
21       Q.  Is there anything else you remember about
22   the discussion with Mr. Lavash?
23       A.  It was just a passing comment.
24       Q.  You didn't inquire further?
```

```
                                               Page 144
 1       A.  I didn't.
 2       Q.  We'll go to the next exhibit.
 3           (Exhibit 11 marked for identification)
 4           (Document exhibited to witness)
 5       Q.  I show you -- I'm not going to show you.
 6   You already have in front of you, Mr. Gavin, what's
 7   been marked as Exhibit 11; is that correct?
 8       A.  Correct.
 9       Q.  Have you seen that document before?
10       A.  Yes, I have.
11       Q.  Do you know what that is?
12       A.  I'm not sure what the technical term is.
13   But, yes, I know what it is.
14       Q.  Is it your understanding that, that's the
15   complaint which initiated the proceedings that bring
16   us here today?
17       A.  I believe so.
18       Q.  Let me call your attention to page three,
19   paragraph six.
20       A.  Okay.
21       Q.  The second sentence of paragraph six states,
22   quote, upon information and belief, Bull
23   intentionally did this to avoid the significant
24   financial costs of providing Gavin with benefits to
```

```
                                               Page 145
 1   which he was entitled.  Close quotes at that point.
 2   That refers to characterizing you as an independent
 3   contractor, correct?
 4       A.  Yes.
 5       Q.  What is the basis for your belief that Bull
 6   intentionally did this to avoid financial costs?
 7       A.  Well, my belief is that the size of the
 8   company that Bull is, they would know what the legal
 9   aspects of hiring someone are.
10       Q.  Anything other than that?
11       A.  No, I don't believe so.
12       Q.  Is it your claim that the company did this
13   intentionally to deprive you of benefits?
14       A.  I don't know that.
15       Q.  You don't know that?
16       A.  No.
17       Q.  You've testified already to your leaving the
18   company and then coming back to work for Mr. -- I've
19   lost track of his name, unfortunately.
20           MS. HARRIS:  Haskell.
21       Q.  Haskell, thank you.  I may have already
22   asked you this question, but when you came back, did
23   you go to work at the same desk that you worked at
24   before you left?
```

Page 158

1  A. He would have rather had me there 7 o'clock
2  in the morning. But that was impossible.
3  Q. Did he tell you that?
4  A. At one time he said, "Why don't you come in
5  at seven and leave at four." I said, "That's
6  impossible. There's no way I can do that."
7  Q. How long a commute was it for you from
8  Millis to Billerica?
9  A. An hour on a good day.
10 Q. I'm trying to get a time frame on when --
11 I'm going to butcher his last name.
12 A. Stravropulous.
13 Q. Mr. Stravropulous told you he wanted you
14 there, can you put a time frame on that?
15 A. Again, that's got to be late '90's, 2000.
16 Q. But until then, nobody had told you that you
17 needed to be on site; is that correct?
18 A. It was a given.
19 Q. Well, let me ask the question this way.
20 Nobody told you, you had to be on site, correct?
21 A. Nobody told me directly, but there was no
22 other way to do it.
23 Q. Right. Is that because your clients were
24 internal clients?

Page 159

1  A. They were internal clients.
2  Q. In essence, your department provided a
3  service for other departments in the organization?
4  A. That's correct.
5  Q. Is it fair to say that your department
6  provided a service that those departments did not
7  have the capability to provide for themselves?
8  A. That's correct.
9  Q. You already mentioned you did some work for
10 human resources, for example; is that correct?
11 A. Correct.
12 Q. What other departments would you do work for
13 internally?
14 A. Probably all of them at one point or
15 another.
16 Q. Marketing?
17 A. Marketing.
18 Q. Manufacturing?
19 A. Payroll.
20 Q. Just about every department?
21 A. Everybody.
22 Q. You were a resource for those other
23 departments?
24 A. Yes.

Page 160

1  Q. After you moved to Billerica, you indicated
2  you had cubicles?
3  A. Yes.
4  Q. Did you have your own cubicle?
5  A. I did.
6  Q. By that point, did you have your own
7  computer or was that sometime after that?
8  A. Own computer at Bull?
9  Q. At Bull, yes.
10 A. I had my own computer in Waltham.
11 Q. Okay, you did, okay.
12 A. One of two.
13 Q. What's that?
14 A. One of two.
15 Q. You had two computers at Waltham?
16 A. No, one was assigned to me.
17 Q. Was that a Mac?
18 A. Yes.
19 Q. What was the other, was the other one a PC?
20 A. No, it was a Mac.
21 Q. Why did you have two Mac's assigned to you?
22 A. Only one was assigned to me. There were two
23 computers in the department. One was assigned to
24 me.

Page 161

1  Q. One was assigned only to you?
2  A. Only to me.
3  Q. Why was that?
4  A. I was the best in that department.
5  Q. So the other people who were doing graphic
6  arts work did not have their own computer?
7  A. Correct. At that time frame they were still
8  doing a mix of computer graphics and board work.
9  Q. Okay. Board work meaning the pre-computer?
10 A. Meaning on a drafting table pasting the wax
11 down, pasting the type down.
12 Q. Pre-historic work now?
13 A. Yeah.
14 Q. Let me call your attention to paragraph
15 eight of Exhibit Number 11, which states that Bull
16 provided you with the same templates, tools,
17 materials and equipment it provided those classified
18 as employees; do you see that?
19 A. I see that.
20 Q. Do you know what it meant by templates?
21 A. Templates we had pre-printed called blue
22 lines. They were pieces of heavy paper with a page
23 layout on it, and all the grid lines were where the
24 type goes, where the logo goes. It was a basic

41 (Pages 158 to 161)